# UNITED STATES
*v.*
# VICENTE BALBAS CAPO.

San Juan, Criminal, No. 673.

### ON MOTION FOR NEW TRIAL.

Espionage Act—Intent.
 1. The Espionage Law is designed to punish the intent, and the result of the intent is not material. The intent is for the jury,

NOTE.—On decisions under the Espionage Act of June 15, 1917, see note in L.R.A.1918F, 410.
 X. Porto Rico.—16.

United States v. Capo.

who must draw it from all the circumstances of the transaction, for it is more than the statements of a printed paper. A person residing in Porto Rico, whether citizen or not, owes temporary allegiance to the United States and cannot be permitted to stab the country in the back.

Opinion filed December 17, 1917.

_Mr. Miles M. Martin,_ District Attorney, and _Mr. Geo. S. Brengle,_ Assistant Attorney General of Porto Rico, for plaintiff.

_Mr. H. G. Molina_ for defendant.

HAMILTON, Judge, delivered the following opinion:

Defendant's counsel does not wish to argue his motion filed for a new trial, and this throws the burden upon the court of passing for itself upon the grounds of the motion.

I would be glad if counsel would present their views on one point, the only one as to which I have had any doubt. It is this. The indictment charges that two articles were pubished on certain dates and the jury has found the defendant guilty on four of the counts, that is to say, he was found guilty on two counts based on the article of October 17, and two counts on the article of November 10. In each instance the counts refer to the question of disloyalty, mutiny, and refusal of duty and interference with the enlistment service of the United States caused by the two articles respectively. There was not very much evidence on one point. The indictment speaks of certain things being done, and towards the end of the indictment there is this expres-

United States v. Capo.

sion: "The Grand Jurors further present that the object and intent of the said words made, published, and conveyed as aforesaid was to cause insubordination, disloyalty, mutiny, and refusal of duty in the military and naval forces of the United States, to the injury of the United States, contrary to the form of the statute." In each instance the act is stated as "to the injury of the United States." Now in point of fact there was little or no evidence as to the injurious effect of these articles. I call your attention to this one point, whether it is necessary to prove such injury as resulting from the articles. A motion has been made for a new trial; ten grounds are mentioned. They mainly refer to what has already been passed upon directly as the questions came up, and the court is not at all convinced that it made any error in the respects mentioned. The point upon which the court wishes light is the one that has just been mentioned.

Here is a case of a man who was apparently a citizen of Porto Rico. There was no such thing until the American Occupation, but the Foraker Act seems to have created that name and the defendant was one of those citizens. The sovereignty, nevertheless, was in the United States, and the political condition of the Porto Ricans was at first uncertain. By the treaty of Paris it was to be defined, the political status of Porto Rico was to be settled by the United States, and the United States created this political body in 1900 or thereabouts. In 1917 the United States passed a further act called the "Jones Act," which extended the privileges of the people living in Porto Rico and made them citizens of the United States, made them fully Americans. Now the defendant, according to the evidence, had for a good many years been contending that American citizen-

United States v. Capo.

ship should not be the result, that Porto Rico should be made independent, and the Porto Rican as such have a citizenship of his own. All this comes out in the evidence introduced by the defendant. It was his perfect right at one time to make any argument to induce Congress to adopt that view and to urge it on the people here. Congress did not adopt that view except to the extent of giving the Porto Ricans the right—a plebiscite it has been called by the defendant—for six months to determine that they did not want to become American citizens. That time expired September 3. Up to that time, if there had been nothing else in the way, it might have been the defendant's right to urge the people to follow that course, but in April, April 17 I think, a little over a month after Congress had passed that law, the United States entered upon a war with Germany.

The articles for which the defendant has been convicted are those of October 27 and November 10, long after the declaration of war, some time after the expiration of the six months for the plebiscite. It was while the United States was at war and when the time allowed by Congress had expired for advocating the independent citizenship of Porto Ricans, and after Congress on June 15 had passed the Espionage Act prohibiting anything intended to interfere with the military forces and recruiting service of the United States. The rights of all persons had become materially changed. Much that was lawful before had become unlawful. Then it was defendant published his articles.

The indictment alleges that he published each article for a double purpose. It is found by the jury that the article of October 27 makes false statements as to the allotment of troops among the states and territories, and that the same was made

(1) to create disloyalty among the forces of the United States, naval and military, and (2) also to interfere with the enlistment of recruiting service of the United States. The jury has found him guilty on these two charges. The article of November 10 in English—the other was in Spanish—was of a different character. It was not a news article, and it declared that the United States made the Porto Ricans American citizens in order to make them serve in the military and naval forces of the United States, and was a criticism on the alleged ruling of the provost marshal regarding the 288 Porto Ricans who had renounced American citizenship. Whether there was any such ruling or not does not seem to be brought out in the evidence. The 288, or so many of them as were between the ages of twenty-one and thirty-one years, were, according to this ruling, liable to military service. Defendant's article was an indignant criticism of that ruling. The jury found on the second article just as on the first, that it was written and published (1) with the intent to cause disloyalty among the American forces, and (2) to interfere with the enlistment of the military and naval forces of the United States. That has been the finding of the jury. There was no evidence, unless it may be by inference, that these articles actually did have that result. The evidence introduced was directed to the articles themselves,—what intent may be drawn from the articles and their publication. (After argument by counsel the court said:—)

The court asked enlightment and assistance as to whether the alleged result must actually be proven. Both the government and the defendant confess that there is no authority on the subject except incidentally the Masses Case, which is not at all conclusive because it was not a criminal case, but simply related

to injunction against the postmaster for excluding magazines from the mails. This cannot be considered as a definite authority upon which to decide a criminal case; so the court is face to face with that difficulty. The government did not prove that the actual result of these articles was to prevent anybody from enlisting or to make anybody disloyal to the United States, and the court has to decide whether the statute contemplates, that; if it has not been proven that one person had not enlisted or had proven disloyal on account of each or any one of these articles, a defendant is guilty. What is the situation when such result is not proven? There is no doctrine of lèse majesté in the United States. A person can say and publish whatever he pleases; so far as that is concerned there is perfect freedom of the press. The only limitation is that after it is published the editor is liable for what was said unlawfully. There must be that strict liability. What is to be done upon a motion for a new trial when no proof was made of the results of what was done? Is that the meaning of the law, or does the government have to go further and prove that something follows from the publication? Ordinarily any indictment following a statute recites that the things charged were done and at the end of each count that the same was "contrary to the form of the statute in such case made and provided and against the peace and dignity of the United States.

Now, is that the case, was injury shown, or can that be inferred from the evidence? There is no direct evidence. The court has to decide upon other grounds. From analogy with indictments with the words, "against the peace and dignity of the United States," is this injury to be construed as a formal averment not to be proved? What was this statute designed to

prevent, what the circumstances under which it was enacted? The circumstances were these: the United States was at war and this particular statute covers in thirteen titles many sections designed to secure the advancement of the United States and its purposes during that war. The first title is the one on the subject of Espionage, and says that a person who makes a plan of a fort—there are different modes of expression—makes a drawing of a fort, and delivers it to the enemies of the United States, shall be punished by death. It does not say that that fort must be captured by the Germans in order that the man be punished by death, but only that he shall have done all that he could to secure the rendition of that fort. It surely would not, in order to convict a civilian Benedict Arnold, be necessary to show West Point was surrendered.

Now take any case one pleases,—say the Masses Case, 157 C. C. A. 398, 245 Fed. 102, What result could be proven? If the New York Herald should publish an article intended to injure the United States, to injure its service, in the baldest possible language, in the most reasonable language,—suppose that was done, could the government prove that there was any effect; must the government prove that John Smith had failed to enlist on that account? This would require another law looking into the human breast to tell what was the result, and if the government is to be limited to a trial in which that must be proven, there could be no conviction. Nine times out of ten traitors would go free without any fear at all of the law. Another thing, if the act meant that the result must be proven, it would seem that the way to express it would be this,—Be it enacted by the Congress of the United States that when enlistment is interfered with by reason of the publication in a news-

paper, the publisher shall be punished, etc. That would be perfectly clear; but that is not the way the law is framed. So I must conclude that this was not the intent of the law, that the prohibition of the law is not so much the actual result as the intent with which some act is done, such as the intent to injure the enlistment. If a man aims a loaded pistol at another and pulls the trigger, there are two possible things,—he may kill the man, in which case he will be guilty of murder, or the pistol may not go off or be knocked up, but nevertheless he will be guilty of a crime. The evil intent would be present with a forbidden, criminal act.

Congress in this particular act would seem to design to punish the intent and has not laid any stress upon the result; and I take it that this is about all that Congress could do. It would be almost an impossibility to prove the result of the publication upon the registration or disloyalty, as the case may be.

As a result of the argument and the consideration to which it has given rise, it must be held that the result of the publication need not be proved, provided the intent has been. Now this is not saying that everything which indirectly interferes with the enlistment, etc., is punishable. The act punished must be one with that direct intent or tendency.

This conclusion brings up another question as to the intent in this particular case. Was the court right in submitting the intent to the jury, or should the court itself have construed the intent from the documents themselves? I take it there is no doubt about the duty of the court under those circumstances. The American theory is for criminal cases to be tried as far as possible by a jury, and not by a court. Then again in this particular case the intent must be drawn from all the circumstances

United States v. Capo.

surrounding the transaction. It was something more than the statements of the paper themselves and so was for the jury. Therefore the conclusion must be that the defendant has been properly convicted by the jury, and that the verdict cannot be disturbed on the grounds which have been suggested to the court.

It follows that the motion for a new trial must be denied.

(After the statements of the prisoner and his counsel, when asked if he had anything to say why sentence should not be pronounced, the court said:—)

I have heard the remarks of the prisoner and his counsel with deep interest and with sympathy. The most painful duty that a judge has to perform is to pronounce sentence, and there are those here who could say that in this particular case the matter has been one of the deepest consideration to me both by day and by night. I have this abiding consolation, however, that, if I make a mistake, there are other branches of the government which can correct the mistake, and, recollecting this, I will go forward to all that remains for me to do.

In this case there could not be a light sentence. If it were left to me alone as an individual, that would be a different matter, but this is not true. I would be unworthy of this place if I were to let my own feelings, one way or the other, influence me. The jury has found this man guilty of four different offenses; that is the way the matter stands technically. There were two articles and two counts for each article on which he has been found guilty, according to the verdict of the jury, which I cannot disturb. He is either a foreigner or a citizen. If a foreigner, he should have followed the advice given by the Attorney General long before the articles were written,—to keep silent and mind his own business. If he owes allegiance to the

United States v. Capo.

United States as a citizen, he owes the duty at least to do nothing that a citizen should not do. Instead of that he has published seditious articles, forcibly and well written, and for which the defendant deserves credit in one respect,—he has been above board, what he has said he has said openly. There may be others who have said and done similar things not openly, and if they were before me their punishment would be proportionate to that fact. What he has done, according to the jury, amounts to interfering with the organization of the Army of the United States, which is its sole protection in this world war. Not only that, but it is, as we believe, the greatest weapon ever forged for rendering the world safe for democracy. Now what he has done, according to the verdict of the jury, is to interfere with this. Whether a citizen or not, he resides here and he owes at least temporary allegiance to the United States, and according to the verdict of the jury he has inflicted a wound upon this country, and he stabbed it in the back. That is nothing light. I will impose the sentence which the statute under such circumstances justifies.

Prisoner at the bar, the sentence of this court is that you be confined in the penitentiary, which under proper proceedings of this court will be that at Atlanta, Georgia, for two years on each successive count of the indictment of which you were found guilty, that is, on four counts, amounting to eight consecutive years in all, and to pay a fine of $1,000 on each count, making a total of $4,000.

You are now given into the custody of the marshal for the performance of the sentence in due course.